# SUPREME JUDICIAL COURT

#### FOR THE

## COUNTY OF SUFFOLK, NOVEMBER TERM 1848, AT BOSTON.

PRESENT:

HON. LEMUEL SHAW, CHIEF JUSTICE.
HON. SAMUEL S. WILDE,
HON. CHARLES A. DEWEY,
HON. THERON METCALF, } JUSTICES.
HON. RICHARD FLETCHER,

---

COMMONWEALTH *vs.* WILLIAM STODDER.
COMMONWEALTH *vs.* PETER HARNEY.
COMMONWEALTH *vs.* HAMILTON THOMPSON.

Under the provisions of the act of 1847, c. 224, the mayor and aldermen of the city of Boston have authority to make regulations as to the use of omnibuses and stage coaches, for the transportation of persons for hire from Roxbury to Boston and from Boston to Roxbury, while passing over and using the public streets of Boston; if, in the opinion of the mayor and aldermen, from the character of such vehicles, as to size, numbers, or mode of use, they would otherwise endanger or greatly incommode the public generally, who have occasion to use such public streets; and such regulations may prescribe certain streets as the route of travel for the vehicles mentioned in the same, and may provide for their exclusion from certain other streets; provided such regulations are " necessary and expedient for the due regulation," within the city of Boston, of the omnibuses and other vehicles therein specified.

The act of 1847, *c.* 224, does not authorize the mayor and aldermen of Boston to require the payment of money to the city by persons resident in Roxbury, who may set up and drive omnibuses and stage coaches from Roxbury to Boston and from Boston to Roxbury, for the conveyance of persons for hire, as a tax or duty upon such vehicles, before so using the same.

The act of 1847, *c.* 224, does not authorize the mayor and aldermen of Boston to pass an ordinance, requiring persons resident in other towns and cities, and setting up and driving omnibuses and other vehicles from such towns or cities to the city of Boston, and back to their respective stations in such other towns and cities, for the transportation of passengers for hire, to obtain a license therefor, (irrespective of the requirement of the payment of money for the same), from such mayor and aldermen.

THESE were complaints against the several defendants, for breaches of an ordinance of the mayor and aldermen of the city of Boston, adopted on the 12th of July, 1847, under and by virtue of the act of 1847, *c.* 224, for the purpose of regulating the use of hackney coaches and other vehicles within the city.

The first section of the act of 1847, *c.* 224, entitled " An act to prevent obstructions in the streets of cities, and to regulate hackney coaches and other vehicles," provides as follows : —

" The mayor and aldermen of any city in this commonwealth shall have power, from time to time, to make and adopt such rules and orders, as to them shall appear necessary and expedient, for the due regulation in such city of omnibuses, stages, hackney coaches, wagons, carts, drays, and all other carriages and vehicles whatsoever, used or employed wholly or in part in such city, whether by prescribing their routes and places of standing or in any other manner whatsoever, and whether such carriages and other vehicles as aforesaid are used for burden or pleasure, or for the conveyance of passengers or freight or otherwise, and whether with or without horse or other animal power."

The second section provides, that " The mayor and aldermen of any city may annex penalties for the violation of any such rules and orders, as are authorized in the first section, not exceeding twenty dollars in any one instance ; which pen-

alties may be recovered for the use of the city by complaint before the police court of such city, or any justice of the peace in a city where no police court is established."

The third section repeals certain acts and parts of acts relating to the same subject in the town and city of Boston.

The first eight sections of the above mentioned ordinance of the mayor and aldermen, are as follows : —

" 1. Every hack, stage coach, omnibus, cab, chariot, coachee, landau or other vehicle, whether on wheels or runners, drawn by one or more horses, or other animal power, which shall be used in the city of Boston for the conveyance of persons for hire, shall be deemed a hackney carriage, within the meaning of these regulations.

" 2. No person shall set up, use or drive in the city of Boston, any hackney carriage for the conveyance of persons for hire without a license from the mayor and aldermen, under a penalty of not less than five nor more than twenty dollars, every time such carriage is used.

" 3. The mayor and aldermen for the time being will from time to time grant licenses to such persons and upon such terms as they shall deem expedient, to set up, use or drive hackney carriages for hire within the city of Boston, and they may revoke such licenses at their discretion ; and a record of all licenses so granted shall be kept by the city marshal.

" 4. No such license shall be granted to any person who is not a citizen of the United States, and who is not of the age of twenty-one years.

" 5. All licenses granted as aforesaid shall expire on the first day of July next after the date thereof, and no license shall be sold, assigned or transferred, without the consent of the mayor and aldermen indorsed thereon, by the city clerk, for which a fee of one dollar shall be paid.

" 6. The person, in whose name a license is taken out for a hackney carriage, shall, for all the purposes of these orders, be considered as the owner of the same, and liable to all forfeitures and penalties herein contained, unless upon the sale of his carriage, notice be given thereof to the city clerk; and the license delivered up to him.

" 7. That each license of any omnibus belonging to any line may specify the time that said omnibus shall leave their stand, and no omnibus shall leave the stands designated for them, until five minutes shall have elapsed after the departure of the omnibus immediately preceding, under a penalty of not less than two nor more than twenty dollars for each offence.

" 8. Every person who may be licensed as aforesaid, shall pay, for the use of the city, for each hackney carriage which such person shall keep for hire, and which stands on the owner's premises, the sum of one dollar, and the like sum for the renewal thereof ; and for every hackney carriage or omnibus which belongs to any line, and capable of carrying not to exceed fourteen passengers, and which has a stand in any street or square, the sum of two dollars, and the like sum for the renewal thereof ; and for every omnibus which belongs to

any line, capable of carrying more than fourteen passengers, the sum of five dollars, and the like sum for the renewal thereof; and for every cab or other carriage, capable of carrying not to exceed four passengers with their baggage, drawn by one horse, which has a stand in any street or square, the sum of twenty dollars, and the like sum for the renewal thereof; and if drawn by more than one horse or other animal, the sum of twenty-five dollars, and the like sum for the renewal thereof; and all the drivers of all such carriages, except omnibuses belonging to a line which have a stand in any street or square, shall be licensed as such, and shall not be allowed to drive any such vehicle without such license."

The sixteenth section of the ordinance prescribes the stands and routes for the several lines of omnibuses running into and within the city. The first paragraph is as follows : —

"*Roxbury Lines Stand.* The easterly side of Tremont Street, near King's Chapel burying ground. The route for all two horse coaches shall be down Tremont Street to School, down School to Washington, through Washington or Tremont Street to Roxbury, and return by the same route. All four horse coaches to go down Tremont Street to West, then through West to Washington, through Washington Street to Roxbury, and return by the same route."

These complaints were originally instituted in the police court of the city of Boston, from whence they were carried by appeal to the municipal court, where they were tried before *Perkins*, J., at the October term, 1848.

The complaint, in each case, alleged, that the defendant, at Boston, on a certain day named, " did drive a certain hackney carriage, viz. an omnibus, in Washington Street, in said city, for the conveyance of persons for hire, without a license from the mayor and aldermen of said city so to do," &c.

At the trial of the first entitled case, it was proved and admitted as follows : —

1st. That at the time when, &c., the defendant was a resident of Roxbury, in the county of Norfolk, and the driver of an omnibus owned and set up by Horace King, a citizen of said Roxbury, whose servant in that behalf he was; that such omnibus belonged to a line of omnibuses, running several times each day (Sundays excepted) from the centre of the most populous part of the city of Roxbury, to and through the public streets and highways of the city of Boston, for the conveyance of passengers, for hire, to and from said Roxbury

and Boston ; taking and leaving way passengers· on its route at intermediate points between and in said cities ; and having a stand to receive and discharge passengers in one of said public streets or highways ; the said omnibus being capable of carrying more than fourteen passengers, and being one of the Roxbury line, so called, established more than twenty years ago, and ever since used as aforesaid.

2d. That at the time when, &c., the defendant was an inhabitant of this state, and was a citizen of the United States, and was of the age of twenty-one years, and had been for several years employed as a driver of omnibuses and other carriages, and was a skilful, careful, and experienced driver.

3d. That at the time when, &c., the defendant did drive said omnibus on the said route, for the conveyance of persons for hire, as aforesaid, without a license from the mayor and aldermen of the city of Boston.

4th. That prior to the time when, &c., said King, as proprietor of such omnibus, did duly apply to the city authorities of the city of Boston for a license to use the same as he had been accustomed to do, in the public streets or highways of said Boston other than those prescribed for the "Roxbury lines " in the by-law mentioned in said complaint, which license was refused.

Upon these facts, the defendant prayed the court to instruct the jury : —

1st. That the mayor and aldermen of the city of Boston had no lawful authority to pass a by-law, which should require the defendant (under the facts proved) to be licensed by them to drive an omnibus, for the purpose and in the manner shown by the evidence in this case.

2d. That by the true construction of the by-law in question, (if the same is valid,) it was necessary, in order that he might lawfully drive such omnibus, that the person who set up and used the same, so to be driven by the defendant, should first obtain a license and pay money therefor to the use of the city of Boston, and that the mayor and aldermen had no lawful right to pass any by-law requiring such license and payment of money.·

3d. That said by-laws require that any license, that shall be granted to any person to drive any such omnibus, as that driven by the defendant, shall define the route or streets in which only the same shall be used or driven, under a penalty for any deviation therefrom ; and that said by-laws further prescribe, that every omnibus used or driven to and from the city of Roxbury, of the kind and in the manner shown by the evidence in this case, shall, if licensed, be excluded from the use of a large portion of the public streets and highways of the city of Boston, and be allowed to use only a small portion thereof, extending only part way into said city ; and that such by-laws, so far as they require the defendant to procure a license, or to be restricted to the use of such route and streets as are specified therein, are wholly unlawful and void.

4th. That said by-laws, so far as they attempt to regulate the drivers of omnibuses and other hackney carriages, and to prescribe their rights and duties, are not to be construed to apply to the drivers of omnibuses which may be driven into Boston from other cities and towns, and do not apply to the defendant, under the facts shown in this case.

5th. That if said by-laws are so to be construed as to apply to such omnibuses or hackney carriages, as may be driven into the city of Boston from other cities and towns, then the same are illegal and void.

6th. That so much of said by-laws (if any) as require of the defendant that he shall obtain such a license as is set forth therein, or as prescribe the extent and mode in which the public highways shall be used, and the other obligations and duties of the defendant as driver, and such parts thereof as require the owner of such omnibus to obtain a license and pay money therefor, in order that the defendant might lawfully drive the same, is illegal and void, as being partial, unreasonable, in restraint of trade, and against common right.

7th. That the defendant, under the facts proved, was not required by any of said by-laws to obtain any license.

The presiding judge, thereupon, for the purposes of the trial, declined to give any of the instructions above mentioned; but directed the jury otherwise, and that upon the facts aforesaid the complaint was well sustained, and that the defendant was guilty.

The jury accordingly returned a verdict of guilty, and the defendant alleged exceptions.

At the trial of the two other entitled cases, the same facts were proved or admitted, as are above set forth, and the same proceedings took place, except that, in Harney's case, it was proved that he was not a citizen of the United States, and in Thompson's, that he was not of full age.

*S. Bartlett* and *H. W. Fuller*, for the defendant.

*S. D. Parker*, county attorney, (with whom was *P. W. Chandler*, city solicitor,) for the commonwealth.

DEWEY, J.* The present case comes before us on exceptions to the ruling of the municipal court, upon the trial of a complaint originally instituted in the police court for the city of Boston, and carried by appeal to the municipal court.

The defendant admitted, upon the trial, that he had driven an omnibus set up by a citizen of Roxbury, which carriage run several times each day from the centre of the most populous part of the city of Roxbury, through the public streets of the city of Boston, for the conveyance of passengers, for hire, to and from Roxbury and Boston, and that he drove the same without any license from the mayor and aldermen of Boston.

The defendant denies that this constitutes an offence, for which he is liable to any penalty or forfeiture. The grounds of the defence raise the question of the legality of the ordinance of the mayor and aldermen, adopted July 12th, 1847 ; the prosecution being instituted to recover a penalty for a violation of that ordinance.

In the arguments addressed to the court, the question was somewhat discussed, as to the power incident to municipal

* Mr. Justice FLETCHER did not sit in these cases.

corporations, to create by-laws of the character here adopted ; and a reference was made to various cases in the English courts, where questions of this nature had arisen. Upon examination of those cases, they will be found less important and less satisfactory as guides here, inasmuch as it is quite obvious, that in many of them, and particularly those where the ordinance seemed most questionable, as not being within the ordinary exercise of municipal authority, the by-laws were sustained, upon the ground of ancient and long continued usage, ripening into a prescriptive right, on the part of the municipal corporation.

No such ground can be urged here, and the present ordinance, if sustained at all, must be shown to be authorized by the express provision of the charter, or be derived as an incidental power resulting from its incorporation as a city, or be found in some general or special statute.

The city charter (*St.* 1821, *c.* 110) contains various provisions bearing upon this subject, (see §§ 1, 13, 15,) which it seems unnecessary particularly to consider, because the power is more directly given to the mayor and aldermen, to act upon this subject, by the statute of 1847, *c.* 224.

By this statute, it is enacted, that the mayor and aldermen of any city shall have power to adopt such rules and orders, as to them shall appear necessary and expedient, for the due regulation, in such city, of omnibuses, stage coaches, &c., used wholly or in part in such city, whether by prescribing their routes or places of standing, or in any other manner whatsoever. The ordinance of July 12th, 1847, was obviously passed under the authority supposed to be conferred upon the mayor and aldermen by this statute.

We are then brought to the inquiry, whether the authority vested in the mayor and aldermen by the above mentioned statute will authorize the ordinance now sought to be enforced. This question must be answered by considering somewhat in detail the various provisions of the ordinance.

1. As to those portions of the ordinance prescribing the routes and streets, on which certain lines of omnibuses were

48 *

to pass, and prohibiting such vehicles from being driven on any other route than those thus prescribed, and prescribing their stands.

Regulations of this nature are regulations as to the use of omnibuses and stage coaches, while passing over the public streets of the city, and are within the legitimate powers of the mayor and aldermen. The public safety and convenience of travellers may require regulations of this character. If new and unusual modes of transporting persons over the public streets are introduced, which, from the methods made use of for propelling the carriage, or the size of the vehicle, or the number of horses attached thereto, will obviously endanger the public safety, or so engross the whole width of the street as virtually to exclude all other vehicles, or greatly to obstruct them in their passing thereon, it would certainly be reasonable and proper and within the legitimate powers of the mayor and aldermen, under the statute already cited, and the powers conferred by the city charter, to regulate the route of the streets over which such carriages were to run, and the rate of speed, and to interdict the stopping in the public streets unnecessarily, to the great hinderance and delay of those in the rear travelling on the same route.

We perceive nothing objectionable in an ordinance, by the mayor and aldermen, providing for the safety and convenience of the public generally, by prescribing, by a general by-law or ordinance, certain streets or portions of streets, to be used for travel by vehicles, exposing by their manner of use the lives and limbs of the public generally, who may have occasion to use the public streets, if such vehicles are permitted to use the public streets indiscriminately; and such regulations and restrictions might be warranted even to effect the minor object, that of preventing the greatly obstructing the free and convenient use of the streets for general purposes, by interdicting carriages of unusual size or drawn by an unusual number of animals, or those of such character as would greatly interfere with the public convenience and safety. To take a strong case: Suppose the proprietor of the omni-

buses from Roxbury should deem it expedient to propel his carriages by steam power, passing through Washington Street, at a rapid rate, would it not be a lawful and proper regulation for the mayor and aldermen to prohibit the using of Washington Street by vehicles propelled by steam power ? We cannot doubt that it would be.

Acting upon this principle, various ordinances have been adopted by the city government regulating the rate of speed of travellers in the public streets, the hour of the day in which the public streets may be used for certain purposes, and excluding vehicles of all kinds from entering upon the sidewalks on the public streets. So far as relates to the restriction of carriages to certain routes, there is nothing in the ordinance preventing any individual from running omnibuses in every direction. The proprietor of the Roxbury omnibuses, although those particular vehicles are restricted to certain streets, has also the free use of the various other streets, appropriated to other lines of omnibuses, if he chooses to set up and run an omnibus thereon, as to Charlestown, or Cambridge, or South Boston.

We cannot doubt that a by-law, reasonably regulating the use of the public streets of the city as to carriages of an unusually large size, or as to those which from the mode of using them would greatly incommode, if not endanger, those having occasion to use such public streets, would be valid and legal ; and that such regulations might prescribe certain streets as the route of travel for such vehicles, and provide for their exclusion from certain other streets.

2. The next inquiry is, whether it was competent for the mayor and aldermen to require as a condition precedent to the setting up of an omnibus, or stage coach, to run from the centre of Roxbury to the central part of the city of Boston, and carrying passengers for hire, the payment of the sum stated in § 8 of the by-law of July 12th, 1847, and the obtaining a license as required in § 2 of the same ordinance.

This question embraces two points of inquiry, which are to some extent distinct in their character : 1. The right to demand the payment of a tax or duty on each carriage licensed,

varying from one to twenty dollars, according to the different kinds of carriages, and the stands they occupied; and, 2. The right to forbid all persons from setting up such omnibuses or stage coaches, without a license from the mayor and aldermen of the city of Boston.

As to the requisition of a payment of money, operating as it does as a direct tax upon the vehicle to be used, we can find no authority for this provision of the ordinance.    Taxes are to be levied under the provisions of general laws enacted by the legislature.    We look in vain for authority for it either in the city charter, or the statutes of the commonwealth. The act of 1847, c. 224, under and by virtue of which this ordinance of July 12th, 1847, was professedly adopted, merely authorized the mayor and aldermen to adopt rules and orders "for the due regulation, in such city, of omnibuses, stages, &c."    The power here conferred was not a tax levying power.    The title of the act was "An act to prevent obstruc-. tions in the streets of cities and to regulate hackney coaches and other vehicles."    All the apparent objects of the act may be secured by due regulations as to the time, place and mode of using such vehicles, irrespective of any payment of a specific duty or tax upon them, as provided in the ordinance. As a tax, it would operate unjustly also, as requiring to be paid to the city of Boston a specific duty or tax upon a vehicle owned and used by an inhabitant of another town or city, in which alone he should be taxed for his personal property.

We are aware, that there are a few cases where a sum of money has been required to be paid on obtaining a license for exercising certain employments.    But they are cases directly authorized by a statute law of the commonwealth.    It would seem to be peculiarly proper where the tax would be a tax upon inhabitants of various towns, that it should be directly authorized by a general law of the commonwealth, in the enacting of which all the towns in the commonwealth would be heard, and would act upon the subject through their representatives.

In the case of *Boston* v. *Schaffer*, 9 Pick. 415 where a

payment of money for a license for a theatrical exhibition was held a legal payment, the by-law requiring the payment of money was held valid as a power clearly conferred by the statute of the commonwealth, (1821, *c.* 10,) authorizing the mayor and aldermen to license theatrical exhibitions, "on such terms as the mayor and aldermen should think expedient," and upon that ground was sustained. It furnishes no authority for an imposition of a tax under the powers conferred upon the mayor and aldermen by the statute of 1847, *c.* 224, authorizing them "to regulate hackney coaches and other vehicles."

If the sum here required to be paid were a mere provision for paying the expenses incident to giving a license, as was apparently the statute of 1796, *c.* 32, requiring the payment of one dollar for each license, it might be unobjectionable, if the requiring the license was itself well authorized; but the dissimilarity in the sums required to be paid, varying as they do from one dollar to twenty dollars, for a vehicle, precludes us from any assumption of that sort. Nor can any such tax be sustained upon the ground suggested in the argument, that the sum levied is not more than sufficient to indemnify for the expenses incident to the supervision of hackney coaches, omnibuses, stages, &c. In no aspect in which we have been able to regard this part of the ordinance, can we view it in any other light, than as an assessment of a tax upon the owners of these vehicles. As such, the court are of opinion, it was without legal authority, and as the obtaining of a license in all cases requires this payment, the ordinance, so far as it ordains, that no person shall set up, use, or drive, in the city of Boston, any omnibus, without a license from the mayor and aldermen, under a penalty of not less than five nor more than twenty dollars, every time such carriage is used, is illegal and cannot be enforced.

A similar question arose in the case of *Dunham* v. *Trustees of Rochester*, 5 Cowen, 466, where, under an act authorizing the trustees of a village corporation to make by-laws "in relation to hucksters, and for the good government of the village," it was held, that the act did not authorize a by-law

that hucksters should be required, before exercising their employment, to take a license, and be taxed a sum varying from five to thirty dollars.

Upon the ground of the requisition of the payment of a sum of money obviously intended as a tax upon the owners of the vehicles, the defence of the present case might well be sustained.

3. But as the other branch of the inquiry has been fully opened in the argument, we have proceeded to inquire further as to the validity of an ordinance of the mayor and aldermen, forbidding any person resident in another town from setting up, using, or driving an omnibus or stage for the carriage of persons for hire, from such other towns to the central parts of the city of Boston, without a license from the mayor and aldermen of the city of Boston, supposing no payment of money had been required. How far the general powers conferred by the city charter and the statutes of the commonwealth may well authorize the city government in requiring licenses previous to the exercise of certain trades or occupations, by citizens of Boston, and wholly within the limits of the city, we have not particularly considered. A long usage of this kind has certainly prevailed to some extent, under the authority supposed to be derived from the general power of the city government ; but, in these cases, it will be seen, that it has usually been vested in the city government by express enactment by a statute of the commonwealth. Thus, the practice of licensing hackney coaches, so long practised in this city, was directly authorized by the statute of 1796, *c.* 32; the licensing of dealers in second hand articles, under a city ordinance, was authorized by statute of 1839, *c.* 53 ; the licensing of theatrical exhibitions by statute of 1821, *c.* 10; and the licensing of porters was also under a statute. On the other hand, the requiring of licenses of common criers, of those persons who are hawkers of goods, and the licenses of chimney sweepers were solely by ordinances.

The requiring a license before any person should be employed in removing house dirt and offal from the city, is by

an ordinance. This latter ordinance came directly before the court in the case of *Vandine, Petitioner*, 6 Pick. 187, and was held a valid by-law.

In the case of *Nightingale, Petitioner*, 11 Pick. 168, a by-law requiring a license before opening for sale certain commodities in certain streets was held valid.

Without calling in question the power of the mayor and aldermen to establish by-laws forbidding the exercise of certain employments, without a license from them, by persons, inhabitants of Boston, and whose business is local, and to be carried on in Boston, such by-laws to be always reasonable in their character, and such as impose no unreasonable restraints upon business or trade, but such as are required for the public health or public safety ; we have more particularly considered the question of the authority of the mayor and aldermen of the city of Boston to enact an ordinance forbidding persons, inhabitants of other towns and residing elsewhere, from setting up stage coaches and omnibuses for the conveyance of passengers for hire from such other towns to Boston, or from Boston to other parts of the commonwealth, without a license from the mayor and aldermen of Boston.

The power claimed here, if really understood by the city government to the extent embraced by the terms of the ordinance, would be the power to control every stage coach and vehicle used for carrying people for hire, though commencing its route at the most extreme limits of the commonwealth, and terminating its route in the city of Boston. Its purpose was probably much more limited, and had particular reference to the numerous lines of omnibuses running from the adjacent towns into the city of Boston. This mode of conveyance is only the conveying by stage coaches in an improved and more convenient vehicle. It is a system of great public convenience, furnishing facilities for passing from the adjacent cities and towns, and ought not to be unnecessarily interfered with by the city authorities of Boston. The much greater part of the whole route travelled may, and in some cases does, lie without the limits of the city of Boston.

Considering the case to be that of an inhabitant of Roxbury, setting up his carriage in Roxbury, and using it for the purpose of conveying persons from Roxbury to the city of Boston, and from Boston to Roxbury, we deem the employment one not within the authority and control of the mayor and aldermen, to any such extent as to authorize them to require a license, before exercising the employment of proprietor of such omnibus, for the conveyance of passengers to and from the central part of the city of Boston.

We do not mean to be understood that no by-law can properly be made, extending to inhabitants of other towns, coming within the limits, and in reference to acts within the city. Corporations, having a territorial jurisdiction, have, to some extent, the power to make by-laws affecting all persons, who come within their territorial limits. It was so held in the case of *Vandine, Petitioner*, 6 Pick 187, and in *Nightingale's Case*, 11 Pick. 168, already cited, but the acts there forbidden had exclusive reference to acts affecting the city. The city government forbade all persons, except such as were duly licensed therefor, to remove offal and dirt from the city, and this by-law was held a valid by-law, as respects strangers coming into the city, and there doing the acts forbidden by the ordinance. So also as to sales of certain articles in certain streets near the Faneuil Hall market.

The case before us is of a different character. The business of carrying persons for hire from town to town, in stage coaches and omnibuses, is not so far a territorial occupation or employment, as will authorize the city government of Boston to require a license from the mayor and aldermen of Boston, before exercising that employment. A by-law, to that effect, is an unnecessary restraint upon the business of those carrying passengers for hire, and not binding upon inhabitants of other towns. For this reason, the by-law must be held invalid as respects the defendant.

The exceptions, therefore, to the rulings of the municipal court, are sustained, to such an extent, as to require the verdicts to be set aside, and new trials to be had.