STATE *v.* HILL.

STATE v. FRED. HILL.

(Decided June 14, 1900.)

*City of Wilmington Ordinance—City Scavenger.*

1. A city ordinance which takes from the citizen a natural and a
   necessary right without apparent necessity, and substitutes
   nothing adequate to take its place, is neither reasonable in its
   provisions nor just in its results.

2. If the owner can not clean his own premises, no matter how filthy
   they may become, and the public scavenger can not be made to
   clean them oftener than once a month without an order from
   the Superintendent of Health, the effect of the ordinance is
   not to keep the city clean, but rather to keep it dirty for the
   time being.

STATE *v.* HILL.

STATE WARRANT heard on appeal from court of Mayor of Wilmington, before *Bryan, J.,* at Fall Term, 1899, of Superior Court of NEW HANOVER County. The defendant was charged with doing scavenger work without license, in violation of an ordinance regulating the sanitary department of the city of Wilmington. The defendant was convicted and fined $5 and costs, and appealed.

Admitted facts are stated in the opinion.

*Mr. L. V. Grady,* for appellant.
*Attorney-General,* for the State.

DOUGLAS, J. · This is a criminal action originally begun in the Mayor's Court of the city of Wilmington wherein the defendant is charged with doing "scavenger work for pay at the surface closet of W. S. Royster, without having license to do such scavenger work and not being employed by the licensed scavenger of the city" of Wilmington. The closet is thereafter referred to as belonging to Neistle. The following are the admitted facts:

That in January, 1899, the defendant made a contract with William Niestle to do his scavenger work for the term of one year by cleaning the closet at his store once a week and that at his residence once every two weeks; that he was to receive 15 cents each time for cleaning the store closet and 25 cents for the residence closet; that he continued to do this work without license after the passage of the ordinance, and that when the contract was made no license was required, and anyone was at liberty to contract for such work. The city ordinance was introduced providing: that the city shall be divided into eight sanitary districts; that "persons proposing to do scavenger work of one or more districts shall submit bids for doing the work for a term of one year;" that "the

board of health may refuse any and all bids for scavenger work, and shall have power to decide who are competent bidders;" that in case of disagreement between the owner or occupant and the scavenger as to the work having been properly done, the question shall be referred to superintendent of health; that "all closets must be cleaned at least *once a month,* and more frequently *if ordered by the superintendent of health;*" that "the charges for cleaning closets shall be governed by the *previous going rates,* and shall not exceed 25 cents per closet in the first, second, seventh and eighth, and in third, fourth, fifth and sixth districts east of Tenth street, and shall not exceed 50 cents in the third, fourth and sixth districts west of Tenth street.

W. R. Slocum testified for the State as follows: "I am the regular licensed scavenger for the city of Wilmington, and the defendant was not working under me at the time he was charged with doing scavenger work without license. I am the only licensed scavenger in the city of Wilmington. I do not receive any pay from the city of Wilmington for my work. I collect of the parties for whom I do scavenger work. *I have it done and pay a certain per cent of the proceeds* of such work for same. *I do not know what per cent I pay*—do not know whether I pay 10 per cent, 25 per cent or 50 per cent. There are no public sewers in the city of Wilmington."

It does not appear what were the charges of the city scavenger, but we presume they were the full amounts allowed, as our attention has not been called to any instance where a municipal contractor, holding an exclusive privilege, has charged less than the maximum allowed by his contract. We do not say that there are no such cases, but their whereabouts are unknown to us. The real point in the case is not very clearly presented by the prayer for instruction, but it clearly

appears from the case itself.    The prisoner is not charged
with carrying on the business of a public scavenger, but
simply with doing the work for one man; and it is admitted
in the argument that the effect of the ordinance would be to
prevent the owner himself from removing the refuse from his
own premises.    This is clearly an interference with a natural
right, and while this may be allowable on the ground of pub-
lic necessity, some such necessity must appear, and the ordi-
nance must be reasonable in its provisions.    *State v. Higgs,*
at this term; 1 Dillon Mun. Corp. (4th Ed.), sec. 319; 2
Wood on Nuisances (3d Ed.), sec. 745; *Mayor v. Redecke,*
49 Md., 217.   Is the ordinance under consideration reasona-
ble in its provisions or just in its results?    We are com-
pelled to think that it is not.    It takes away from the citizen
a natural and a necessary right without apparent necessity,
and substitutes nothing adequate to take its place.    The
owner can not clean his own premises, no matter how filthy
they may become, and the public scavenger can not be made
to clean them oftener than once a month without an order
from the superintendent of health.    This case does not ques-
tion the right of the city to clean all closets, or to have them
cleaned or kept clean; but it involves the right of the owner
himself to clean up.    If the ordinance has that effect, and the
State claims that it has such an effect, then it is void at least
*pro tanto.* In this particular the effect of the ordinance is not
to keep the city clean, but rather to keep it dirty for the time
being.    It is a matter of common knowledge that refuse mat-
ter quickly decays during the summer months, and it can
scarcely be contended that merely a monthly cleaning is suffi-
cient to keep a closet in a healthy condition in a warm climate.
Are the rates allowed to the public scavenger reasonable?
If the ordinance were otherwise valid, we would hesitate to
interfere with it on this ground alone, and we do not decide it

as a matter of law, but to us it seems questionable. What is meant by the words in sec. 7, of the ordinance—"shall be governed by the previous going rates"—is unknown to us, and we have not been favored with any explanation either in the record or the argument. We assume that the scavenger would be entitled to charge 25 or 50 cents, as the case might be, for each time a closet was cleaned. The result to Niestle would be that to have his work done by the city scavenger would cost him at least $19.50, and possibly $39, according to his location. It is now costing him $14 by private contract. The result of the ordinance would be that anyone who lived in the humblest cabin in the farthest corner of the city would be compelled to pay at least $3 a year for the privilege of having a closet, and much more if he wished to keep it in a decent condition. No matter how humble he may be, or how willing to do the most menial labor, he would be compelled to employ the city contractor to clean his own premises, and of course to pay him at the contract rates.

As bearing somewhat on the rate of compensation, we are informed that the city of Raleigh charges a license tax of $1 per year for each surface closet, and keeps it clean without further expense to the owner. We do not know the relative expense of performing such duties in Raleigh and in Wilmington, nor is it within our province to inquire, but such gross disparity might well be questioned on the ground of fairness or necessity.

In the case at bar the defendant could not have obtained a license, even if he had applied for one, as the city was all under contract. Had it not been, he would not have been licensed as a scavenger unless he had bid for an entire district. Even then he had no assurance of obtaining it, no matter how low he bid, as the board of health retained the right to refuse any and all bids, and to "decide who are com-

petent bidders." The public scavenger was not required to do any special duty or to perform his duty in a special manner. He was not required to use carts or implements of any special kind, or to use any special precautions either for cleanliness or disinfection. As far as we can see from the record, the defendant was fully as well equipped for such work as the city scavenger himself, who indeed, does not appear to have performed any personal duties other than perhaps making certain reports, or possibly superintending those who were working for him on shares.

We will briefly examine the authorities that have been cited in support of the contention of the State, none of which are strictly applicable in our view of the case:

In *State v. Hord,* 122 N. C., 1092, the Court says, on page 1094: "Of that the Commissioners, the local Legislature, are the sole judges *unless their ordinance is unreasonable.*"

*Hill v. Charlotte,* 72 N. C., 55, simply holds that a municipal corporation is not liable to an action for damages in the exercise of discretionary powers.

In Vandine's case, 23 Mass., 187, while the Court recognized the power of the city to require public scavengers to take out a license, it held that the ordinance must be reasonable. It says on page 191: "To arrive at a correct conclusion whether the by-laws be *reasonable* or not, regard must be had to its object and *necessily.*" And again on page 192: "We are all satisfied that the law is *reasonable,* and not only within the power of the government to prescribe, but well adapted to preserve the health of the city."

In *Commissioners v. Slodder,* 56 Mass., 562, the Court says, on page 571: "We can not doubt that a by-law, *reasonably* regulating the use of the public streets of the city * * would be valid and legal." It then concludes on page 576 as follows: "A by-law, to that effect, is an *unnecessary*

restraint upon the business of those carrying passengers for hire, and not binding upon inhabitants of other towns.   For this reason the by-law must be held *invalid* as respects the defendant."

The case of *Boehm v. Mayor,* 61 Md., 259, which at first glance seems to fit our case, has really no direct bearing. There, the action was brought by a public scavenger to recover from the Mayor and City Council of Baltimore damages alleged to have resulted from their wrongful act in suspending and revoking his license.   The Court held that the city had the power to pass *reasonable* by-laws requiring a license from a public scavenger, and requiring all refuse matter to be carried off in carts of a certain character; that such by-laws were *reasonable,* and that the plaintiff could not recover damages for the revocation of his license.   The Court in its opinion distinguishes this case from that of *Mayor v. Redccke,* 49 Md., 217, in which certain ordinances of the city of Baltimore were held *unreasonable and invalid.*

In *Louisville v. Wible,* 84 Ky., 290, the Court held that the city could not, upon its mere caprice or to gain a pecuniary advantage, violate a contract which it had made upon a valuable consideration with an individual, whereby it granted to him the exclusive right for five years to the use of its streets for the purpose of removing the bodies of all dead animals from its streets, alleys, etc.   The second head-note of that case is as follows:   "The exclusive privilege of hauling the bodies of dead animals out of a city along its streets, having been granted by the city to an individual, others can not be allowed to buy up such dead animals and haul them out along the streets, although the *original owners have the privilege of thus removing them."*   That case does not appear to be an authority against the right of the owner to remove refuse from his own premises.

The Slaughter House Cases, 83 U. S., 36, discusses at great length and with great ability the question of monopoly under the XIV Amendment to the Constitution of the United States, but they do not appear to us to directly affect the principle now under consideration, that is, the necessity and reasonableness of the ordinance.

We are not disposed to question the law as laid down in 1 Dillon Mun. Corporations, sec. 144, as to the duty and power of a municipal corporation to preserve the public health and safety, but by lawful means, and in subordination to the principles enunciated by the same author in secs. 319, 320, 321, 322, 325. These sections expressly lay down the rule that all ordinances "must be reasonable and lawful; must not be oppressive; must be impartial, fair and general; and must not contravene common right." But one citation remains to be examined, that of *Brodnax v. Groom,* 64 N. C., 244. The subject-matter of that decision was an act of the Legislature providing: "That the Commissioners of the county of Rockingham be and they are hereby authorized to levy and collect a special tax for the purpose of *building and repairing bridges* in said county." The Court says, on page 249: "Repairing and building bridges is a part of the necessary expenses of a county, as much so as keeping the roads in order or making new roads; so the case before us is within the *power* of the County Commissioners. How can this Court undertake to control its *exercise?* Can we say, such a bridge does not need repairs, or, that in building a new bridge near the site of an old bridge, it should be erected as heretofore, *upon posts,* so as to be cheap, but warranted to last for some years, or, that it is better policy to locate it a mile or so above, where the banks are good abutments, and to have *stone pillars,* at a heavier outlay at the start, but such as will insure permanency, and be cheaper in the long run?"

This language, half humorous and half sarcastic, was surely never intended to apply to the constitutional rights of the citizen which are *not* held at the pleasure of a Board of Aldermen, or even of the Legislature.

We do not say that the defendant, or even the owner of the premises, had the right to clean out their closets in a manner offensive to their neighbors, or detrimental to the public health and comfort. They would be subject to such reasonable regulations as were necessary to attain these ends. Nor do we say that the city might not under *reasonable* regulations require anyone to take out license before acting as a public scavenger, or even do the work through its own officers. Such cases are not before us.

We are constrained to say that the ordinance, construed as it appears to us, is not shown to be reasonable, necessary or just; and therefore, being in derogation of common right, must be held invalid in its application to the case at bar.

Error.

CLARK, J., dissenting. One of the most urgent causes for the institution of municipal government is the conservation of public health, and no duty more important is confided to municipal bodies. The nature of the ordinances they shall adopt for that puropse is a matter for their discretion, subject to change by the election of a new board, and not reviewable by the courts unless the ordinance is unreasonable. When people assemble in towns, matters of sanitation which are left to each one's own judgment in the country, become a matter of public concern. It is a matter of common observation that in this matter of cleaning out water-closets, cesspools and sinks, if it is left to each householder, some will be guilty of neglect to the great discomfort of their neighbors, and often to the detriment of the public health; hence it has always been recognized that the regulation of that matter

rested with the municipal authorities. The Code, sec. 3802, confers on towns and cities the power "to pass laws for abolishing or preventing nuisances, and preserving the health of the citizens," and the methods they shall adopt are left (except in cases of abuse) to the "local Legislature," the municipal body. *State v. Hord,* 122 N. C., 1092; *Hill v. Charlotte,* 72 N. C., 55. The latter case says that "nothing can be clearer than that it is left entirely to those authorities to determine what ordinances are proper for those purposes."

In this matter of the best method of having the scavenger work of the city performed, it may be that, if it were for this Court to decide, I should agree with the majority that the best method is to have it done directly by the city through its officers and employees. Such is certainly the manifest tendency of the age as to all matters of municipal interest, including the furnishing of light, water, sewerage, street cars and the like. It is, however, not a matter committed to us, but to the people of each town and city to determine through its local board. When any town, as in the present instance, prefers that the scavenger business, whose proper regulation is of the highest local importance, should be performed by licensed scavengers, giving bond for the faithful performance of their duties, and under supervision of the city health officers, there has been no reason shown why it can not be done. There are ample authorities to that effect.

In Vandine, *ex parte,* 23 Mass. (6 Pick.), 187, as far back as 1828, it was held that a by-law of the city of Boston forbidding anyone to remove night-soil, etc., unless duly licensed by the city was valid, though the Court there say that in their own judgment it would be better if the city would have the work done directly by its own employees than through contractors. This was cited and approved in *Commissioners v. Stodder,* 56 Mass. (2 Cush.), 563.

In *Boehm v. Baltimore*, 61 Md., 259, it was held that an ordinance that "no person shall remove the contents of any privy, well or sink within the limits of the city without having first obtained a *license* so to do,". was a valid ordinance under the power "to preserve the health of the city, and to prevent and remove nuisances"—thus coming within the very letter of our Code, sec. 3802, and the ordinances of the city of Wilmington.

In another late case, *Louisville v. Wible,* 84 Ky., 290, it is held that the city can have such or similar work done by contractors, and that it is no objection to the validity of the contract if there is only one contractor. The above doctrines are laid down as well settled law. 1 Dillon Mun. Corp., sec. 144, n; *Ibid,* sec. 569, and notes.

It was held in Slaughter House Cases, 83 U. S., 36 (which is a thorough discussion of the proposition), that contracts of this general nature are not invalid when exclusive, because they are made in consideration of public services, but in this instance, however, there is no exclusive contract. The ordinance requires advertisements for bids, one contractor at least for each of the eight districts, bonds to be given for discharge of duty, supervision by the health officer, and power reserved to the city to cancel and revoke any contract at will, each contract to be renewed annually. The city's interest is fully safeguarded. It is purely incidental that one man has taken all the contracts, and his doing so in nowise invalidates the ordinance.

The power being clearly in the municipal body to regulate the scavenger work of the city, whether the method shall be directly by the city or by contract under the license system, is for them to decide. This Court can not review their discretion. This is stated in ever memorable words by PEARSON, C. J., in *Brodnax v. Groom,* 64 N. C., at page 250.